## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
===============================
                                :
FIRSTFIRE GLOBAL                :
   OPPORTUNITIES FUND, LLC,      :
                                :
         Plaintiff,             :
                                :
      v.                        :        Civil Action No. _____
                                :
INVENTABIOTECH INC.  f/k/a      :
   WESTMOUNTAIN COMPANY,         :
CYTOBIOSCIENCE, INC., and       :
JAMES R. GARVIN,                :
                                :
         Defendants.            :
                                :
===============================
```

### PLAINTIFF FIRSTFIRE GLOBAL OPPORTUNITIES
### FUND, LLC'S COMPLAINT AND DEMAND FOR JURY TRIAL

### I. INTRODUCTION

1.      The Plaintiff, FirstFire Global Opportunities Fund, LLC (hereinafter "FirstFire" or

the "Fund"), respectfully submits its Complaint and Demand for Jury Trial (hereinafter the

"Complaint") against the Defendants, InventaBioTech, Inc. f/k/a WestMountain Company

(hereinafter the "Company" or "INVB"), CytoBioscience, Inc., (hereinafter "CytoBioscience" or

the "Subsidiary") and James R. Garvin (hereinafter "Garvin"), in the above-captioned action.  The

Plaintiff's allegations, as set out herein, are asserted for injunctive and equitable relief, and for its

general, compensatory and consequential damages arising from, and resulting from, the

Defendants' violations of the following:

a)  Section 10(b) of the Securities Exchange Act of 1934, *as amended* (hereinafter the "Exchange Act" or the "1934 Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5;

b)  breach of contract;

c)  breach of implied covenant of good faith and fair dealing;

d)  unjust enrichment;

e)  breach of fiduciary duty;

f)  fraud and deceit;

g)  negligent misrepresentation; and/or

h)  civil conspiracy.

2.      The Plaintiff further alleges that, as a result and as caused by the Defendants' breaches, actions, omissions, policies, practices, and/or courses of conduct, FirstFire has suffered irreparable harm, requiring injunctive relief and specific performance, harm to its business and reputation in the investment industry, damages from the Defendants' coercion, duress, and unfair and deceptive anti-competitive acts, causing lost revenue, lost profits and prospective business, together with its injuries and damages.

3.      The Plaintiff respectfully requests that its causes of action against the Defendants proceed to a trial by jury, that a judgment be entered on all Counts against the Defendants and that FirstFire be awarded its general, compensatory and consequential damages and losses, costs, interest, plus multiple and/or punitive damages, attorneys' fees, and grant, order and enter temporary, preliminary and permanent injunctive and equitable relief, and grant, order and enter declaratory relief, and any such other relief as this Honorable Court deems just and appropriate.

## II. **PARTIES**

4.     The Plaintiff, FirstFire Global Opportunities Fund, LLC, is a Delaware limited liability company, with its principal place of business located at 1040 First Avenue, Suite 190, New York, New York 10022.

5.     Upon information and belief, the Defendant, InventaBioTech, Inc. f/k/a WestMountain Company, is, and was, a corporation duly organized in the State of Colorado, having its principal place of business and principal executive offices located at 3463 Magic Drive, Suite 120, San Antonio, Texas 78229.

6.     Upon information and belief, the Defendant, CytoBioscience, Inc. (hereinafter "CytoBioscience"), is a wholly owned subsidiary of INVB, and is, and was, a corporation duly organized in the State of Delaware, and having its principal place of business and principal executive offices located at 3463 Magic Drive, Suite 120, San Antonio, Texas 78229.

7.     Upon information and belief, the Defendant, James R. Garvin (hereinafter "Garvin"), was, during the relevant time period, the Chief Executive Officer of InventaBioTech Inc., in Texas and, upon information and belief, is currently a resident of the State of Florida.

## III. **JURISDICTION AND VENUE**

8.     The Plaintiff asserts that this Honorable Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and pursuant to Section 22(a) of the Securities Act of 1933, *as amended*, (hereinafter the "Securities Act" or the "1933 Act"), 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. §78aa(a), pursuant to the federal securities law claims asserted herein arise under and pursuant to Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. The Plaintiff states that this Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

9.      The Plaintiff further contends that, pursuant to 28 U.S.C. § 1391(b), venue is proper in the Southern District of New York in that, pursuant to the Transaction Documents (defined below), the Parties agreed that any and all disputes between and/or among them shall be brought, *inter alia*, in the state or federal courts in New York City, County of New York, and in the State of New York. Additionally, this Court is such District where the Plaintiff is headquartered and has its principal place of business, and is where the violative conduct is alleged to have occurred.

10.     This Court has personal jurisdiction, generally and specifically, over the Defendants by express terms of the Agreement, by the registration of their securities with the State of New York, by, with and as arising from their extensive business contacts, generally over time and specifically in their business dealings with the Plaintiff, in New York City, the County of New York, and in the State of New York.

## IV. <u>FACTUAL BACKGROUND</u>

### A.      <u>The FirstFire / INVB Transaction Documents and Contracts</u>

11.     On or about November 8, 2018, the Company executed, *inter alia*, a certain Securities Purchase Agreement (hereinafter the "Purchase Agreement" or the "SPA") and a certain Convertible Promissory Note, for a total of Two–Hundred–Twenty–Two–Thousand– and Two–Hundred–Twenty–Two and 00/100 (**$222,222.00**) Dollars (U.S.) (hereinafter the "Note") (collectively, with the Officer's Certificate, as defined below, and other documents, hereinafter as the "Transaction Documents"), thereby entering into a contract with the Fund for its investment in INVB. *See* Securities Purchase Agreement, dated November 8, 2018, as attached, restated and incorporated by reference herein as **<u>Exhibit A</u>**; *see also* Convertible Promissory Note, dated November 8, 2018, as attached, restated and incorporated by reference herein as **<u>Exhibit B</u>**.

4

12.     As Chief Executive Officer of the Company, Defendant Garvin executed the Transaction Documents and INVB entered into its investment contract with the Plaintiff, FirstFire Global Opportunities Fund, LLC.

13.     It is undisputed that the Transaction Documents included an Affidavit of Confession of Judgment, dated November 8, 2018 (hereinafter the "COJ"), that was executed under the pains and penalties of perjury by Defendant Garvin, individually and as CEO of the Company. *See* Affidavit of Confession of Judgment, dated November 8, 2018, as attached, restated and incorporated by reference as Exhibit B to the Note. *See* COJ (**Exhibit B**), at pp. 20-22.

14.     On or about November 8, 2018, Defendant Garvin, as CEO of INVB, executed the "Officer's Certificate" of the Company, in which Defendants INVB and Garvin made certain representations of material fact in connection with the offer, purchase and sale of securities to the Plaintiff, the abovementioned transaction with FirstFire. *See* Officer's Certificate, dated November 8, 2018, as attached, restated and incorporated by reference herein as **Exhibit C.**

15.     On or about November 8, 2018 and at the express instruction of Defendants INVB and Garvin, the Plaintiff delivered the funds for its investment in INVB by wiring such monies directly to the Company's wholly owned subsidiary, CytoBioscience, Inc.

16.     As set forth below, the Defendants misrepresented material facts in connection with the offer, sale and purchase of the INVB securities, and breached their various contracts with FirstFire, as memorialized by the Transaction Documents, including but not limited to the COJ and the Officer's Certificate. Thus, the Plaintiff asserts that the Company and Garvin committed federal securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Note, and unlawfully enriched the Subsidiary with FirstFire's assets.

**B.**    **Defendants' Misrepresentations and Omissions of Material Facts and Securities Fraud in Connection with Offer, Purchase, and Sale of Securities**

17.    The Plaintiff asserts and alleges that the Defendants misrepresented, omitted and failed to provide material facts to FirstFire in connection with its investments and in the offer, purchase and sale of securities, and especially with respect to the business, finances, operations and other material matters relating to the Defendants, including but not limited to certain corporate transactions of INVB.

18.    Additionally, by the "Officer's Certificate," Defendants INVB and Garvin made several misrepresentations of material fact and omissions to disclose material facts, under a duty to do so, to the Plaintiff, in connection with the offer, purchase and sale of securities to the Plaintiff, which, upon information and belief, were false and fraudulent, and upon which FirstFire relied, to its detriment. *See* Officer's Certificate (**Exhibit C).**

19.    Solely as an example of the same, on or about November 8, 2018 and by the Officer's Certificate, Defendants INVB and Garvin represented to FirstFire, in connection with the offer, purchase and/or sale of INVB securities, *inter alia*, as follows:

> "The representations and warranties made in the Company in the Purchase Agreement are true and correct in all material respects as of the date of this Officer's Certificate. The capitalization of the Company described in the Purchase Agreement has not changed as of the date hereof."

*See* Officer's Certificate (**Exhibit C**), ¶ 2, at p.1.

20.    By the Officer's Certificate, the Defendants further represented that,

> "As of the date hereof, the Company has satisfied and duly performed all of the conditions and obligations specified [in] the Purchase Agreement to be satisfied on or prior to the Closing Date (as defined in the Purchase Agreement) or such conditions and obligations have been waived expressly in writing signed by the purchaser."

*See Id.* (**Exhibit C**), ¶ 3, at p.1.

21.     Additionally, the Defendants, in the Officer's Certificate, also represented that,

> "The Company has complied with or, if compliance prior to Closing (as defined in the Purchase Agreement) is not required, promptly following the Closing the Company will comply with, the filing requirements in respect of this transaction under (a) Regulation D under the Securities Act of 1933, as amended (the "1933 Act") (and applicable Blue Sky regulations) and (b) the Securities Exchange Act of 1934, as amended.)"

*See Id.* (**Exhibit C**), ¶ 4, at p.1.

22.     On or about November 8, 2018, the Company and Garvin made further representations to the Plaintiff, in the Officer's Certificate, as follows:

> "There has been no adverse change in the business, affairs, prospects, operations, properties, assets or condition of the Company since the date of the Company's most recent financial statements filed with the United States Securities and Exchange Commission, other than losses and matters which would not, individually or in the aggregate, have a Material Adverse Effect (as defined in the Purchase Agreement)."

*See Id.* (**Exhibit C**), ¶ 5, at p.1.

23.     There is no dispute that, at the time such representations and warranties were made by Garvin and INVB, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff. Furthermore, as subsequent events demonstrated, the Company and Garvin materially misled and omitted material facts, with a duty to disclose the same to the Plaintiff regarding its senior executives, finances, capitalization and operations, and even failed to disclose the anticipated departure of Defendant Garvin, as CEO, shortly after the Closing of the FirstFire transaction.

24.     A critical example of the omissions and failures to disclose material information to the Plaintiff by Defendants Garvin and the Company were the subject of a Form 8-K, as filed with the Commission by INVB and signed by Garvin on or about November 9, 2018, *the very next day*

*after the Closing of the FirstFire Transaction*. *See* INVB Form 8-K, dated November 9, 2018 and Period Ending November 5, 2018, attached restated and incorporated by reference as **Exhibit D**.

25.     Unbeknownst to the Plaintiff at the time of the Closing, on or about November 5, 2018, the Chief Financial Officer (hereinafter "CFO") of INVB, Henry Bourg, resigned on that date, effective immediately, and a new CFO, Brian Zucker, was appointed as CFO, also effectively immediately on or about November 5, 2018.  *See Id.* (**Exhibit D**); *see also* INVB Form 8-K, dated November 20, 2018 and as of Period Ending November 14, 2018, as attached restated and incorporated by reference hereto as **Exhibit E** (Form 8-K detailing, *inter alia*, the Defendants' securities transaction with the Plaintiff).

26.     The Company's Form 8-K for the time period ending November 5, 2018 – which was conveniently not filed until November 9, 2018, the day after the Closing of the FirstFire Transaction – stated, in pertinent part, as follows:

> On November 5, 2018, Henry Bourg, Chief Financial Officer ('CFO') of WestMountain Company (the 'Company') informed the Company that he was resigning as CFO effective immediately.
>
> On November 5, 2018, the Company appointed Brian Zucker, CPA, as CFO, effective immediately. *The CFO serves as the Company's principal financial officer and principal accounting officer*."

*See Id.* (**Exhibit D**), Item 5.02, at p.3 (emphasis added).

27.     There can be no dispute that under Rules and Regulations of the U.S. Securities and Exchange Commission (hereinafter the "SEC" or the "Commission") as to Forms 8-K and particularly as to Item 5.02(b) on the resignation of certain officers and/or directors, the Defendants' reporting obligation was triggered by Henry Bourg's notice, as Chief Financial Officer, of his November 5th decision to immediately resign, whether or not such notice is written, and regardless of whether the resignation was conditional or subject to acceptance.

28.     There is no dispute that the Defendants' omissions to disclose material facts in connection with the offer, purchase and/or sale of INVB securities, prior to the November 8th Closing, including but not limited to, *inter alia,* the immediate resignation of CFO Henry Bourg, Company's principal financial officer and principal accounting officer, was in violation of their duty and caused and resulted in the Defendants' representations in the SPA, Note, Officer's Certificate and other Transaction Documents to be materially incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff.

29.     There is no dispute that the Defendants made other misrepresentations and materially false statements in connection with the offer, purchase and/or sale of INVB securities to FirstFire, and which omitted material information with a duty to disclose the same to the Plaintiff.  As subsequent events demonstrated, the Company also made material misrepresentations to the Plaintiff regarding its capitalization, and transactions affecting its capitalization, which the Defendants had failed to completely and sufficiently disclose to the Plaintiff.

30.     As an example of such material misrepresentations, omissions and/or misleading or false information, on or about March 23, 2018, the Defendants published and disseminated certain statements, entitled, "*CytoBioscience, Inc. Announces Merger with WestMountain Company,"* which provided, in pertinent part, as follows:

> *SAN ANTONIO, TX, ACCESSWIRE, March 23, 2018* -- CytoBioscience, Inc. (the "Company"), a revenue-generating ion channel screening business providing medical instrumentation and research services to organizations in the pharmaceutical and drug research market, today announced that it has closed a merger (the "Merger") with WestMountain Company (WASM) ("WestMountain"), effective March 19, 2018.
>
> On March 19, 2018, WestMountain entered into a Merger Agreement with CytoBioscience, Inc., a Delaware corporation (the "Merger Agreement"). As per the terms of the Merger Agreement, a subsidiary of WestMountain merged into CytoBioscience, with CytoBioscience surviving the merger and becoming a wholly-owned subsidiary of WestMountain, and the shareholders of CytoBioscience becoming shareholders of WestMountain. Pursuant to terms of the Merger Agreement, all outstanding shares of

capital stock of CytoBioscience were cancelled and exchanged for the issuance of 42,522,598 shares of common stock of WestMountain. In addition, warrants to purchase 2,040,000 shares of Common Stock of WestMountain were issued in exchange for all outstanding warrants of CytoBioscience, which were cancelled. The closing of the Merger on March 19, 2018 resulted in a change of control of WestMountain. The shares of WestMountain common stock issued to CytoBioscience's shareholders in the Merger constitute approximately 74% of the issued and outstanding shares of WestMountain's common stock as of and immediately after the consummation of the Merger. All of the newly issued shares will be subject to a lock-up agreement which prohibits sales for a period of at least two years. In addition, the directors of the WestMountain will seek shareholder approval to change the name of WestMountain to CytoBioscience, Inc., and new directors will be appointed to the board 10 days after the filing of a Schedule 14f-1 with the Securities and Exchange Commission. In connection with the Merger, Brian L. Klemsz resigned as an officer of WestMountain, and James Garvin, Chief Executive Officer of CytoBioscience, became Chief Executive Officer of WestMountain, Dr. Thomas Knott as the Chief Science Officer of WestMountain, and Henry Bourg became Chief Financial Officer of WestMountain.

Dr. Garvin said, "We very excited about the opportunities this merger gives our combined company and we look forward and are enthusiastic about the new possibilities ahead for us."

31.    Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff in connection with the offer, purchase and/or sale of INVB securities, which closed on or about November 8, 2018.

32.    As a further example of such material misrepresentations, omissions and/or misleading or false information, on or about October 17, 2018, the Defendants published and disseminated certain statements, entitled, "*CytoBioscience: Microcap Play in the $55 Billion Life Science Instrumentation Market,*" which provided, in pertinent part, as follows:

The global life science instrumentation market is projected to grow from $54.5 billion in 2017 to over $75 billion by 2022, according to a September 2017 report from Markets and Markets. The fastest growth is expected to be seen in the research applications segment, driven by evolving global regulatory needs for instrument-based research and analysis, continued growth in genomic research and ongoing integration and automation of laboratory machinery and robotics.

We've been following a San Antonio-based company called CytoBioscience, which became public earlier this year through a reverse merger with WestMountain (WASM[OTO] - $0. (%)) [sic]. The company manufacturers medical research instrumentation and related consumables, and provides contract research services to organizations in the pharmaceutical and drug research market. CytoBioscience's CytoPatch platform was selected by the FDA for use as its key cardiac safety testing instrument in developing new regulations for determining efficacy and effectiveness in drug development. The regulations, known as the CiPA (Comprehensive In-Vitro Proarrhythmia Assay) Initiative, require that all new drugs, regardless of their intended purpose, be tested in a series of assays to determine whether or not they possess pro-arrhythmia potential.

The CytoPatch is a hands-free robotic patch clamping instrument, which uses CytoBiosciences' proprietary software and microchips to test individual cells for specific ion channel responses. Ion channels are proteins that regulate a spectrum of physiological processes including electrical signaling, fluid, hormone and transmitter secretion and proliferation. Ion channel screening enables accurate and detailed examination of cellular activity in order to conduct drug research and assess drug efficacy and safety, in addition to providing detailed analysis of how different diseases may respond to different treatments. About 13% of all marketed drugs act on ion channels.

The CytoPatch list price is $175,000, on which the company retains a 49% gross margin. CytoBioscience believes it has a highly differentiated product offering with CytoPatch, particularly in comparison with other automated high-throughput machines. The fact that the FDA chose CytoPatch over competing machines from much larger companies is high endorsement. CytoPatch has been demonstrated to:

- Complete the entire CiPA Initiative panel at 37 degrees Celsius, human body temperature, which is the optimal environment for the testing cells
- Complete longer and more stable recordings, which provides more accurate data and saves time compared to machines with shorter recording periods
- Complete stem cell cardiomyocytes and fast ligand gates ion channels (NMDA) which CytoBioscience believes are not able to be tested on alternative systems
- Complete mechanical stimulation of cells in order to record the effects on the cells when they are moved or sheeted

Clearly the company's primary challenge will be securing sufficient capital in order to operate and grow the business. The Form 10-Q for the quarter ended June 30, 2018, states, "The Company expects to seek business combinations which could provide a platform for raising the necessary operating as well as research and development funds required until such point that revenue for sales and services are sufficient to fund such activities. The Company anticipates raising additional funds through collaborative arrangements, public or private sales of debt or equity securities, or some combination thereof."

We met CEO James Garvin, PhD, this summer at the National Investment Banking Association (NIBA) conference in New York. The company has been occupied with transition audits since the merger and is working toward a ticker symbol change. Dr. Garvin told the audience during his presentation that the company was seeking up to $5 million in tranched equity financing. The stock is trading at $0.4167 OTC, giving the company a market capitalization of about $23 million. We think having the FDA as its key customer speaks volumes to the quality of the CytoPatch machine and intellectual property portfolio of five active patents and four pending patents in the US, EU and Japan. We'll be keeping close watch on the company to see if it can successfully raise the capital it needs.

33.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff in connection with the offer, purchase and/or sale of INVB securities, which closed on or about November 8, 2018.

34.     Further material misrepresentations, omissions and/or misleading information, on or about November 28, 2018, the Defendants published and disseminated certain statements, entitled "*CytoBiosciences Buys Fellow Targeted Tech Company BioDTech for Stock*" which provided, in pertinent part, as follows:

> *Xconomy Texas — San Antonio* — One portfolio company of investment firm Targeted Technology is acquiring another.
>
> San Antonio-based CytoBioscience, through its parent company, is buying BioDtech, a Birmingham, AL-based maker of technology for detecting and removing endotoxins, toxins that are carried within the cell walls of certain bacteria and associated with various types of infections, according to a securities filing. WestMountain Co., which became the parent of CytoBioscience in March, made a verbal agreement to issue almost 2.5 million shares of its stock to the owners of BioDtech to acquire the business. The deal is valued at $1.85 million, according to the filing.
>
> San Antonio-based Targeted Technology invested in BioDtech in 2010 and CytoBioscience in 2016, according to its website. Founded in Germany, CytoBioScience moved to San Antonio in 2015. It sells a device, the CytoPatch, for screening the safety and efficacy of drug formulations, as well as various other medical tools, to researchers. BioDtech was founded in 2003.

Meanwhile, WestMountain is seeking to change its name to InventaBioTech to reflect its role in selling research instrumentation and as a contract research organization, according to a second securities filing. WestMountain, which is traded on the over-the-counter public markets under the ticker "WASM" and was previously based in Fort Collins, CO, merged into CytoBioscience in March, and CytoBioscience CEO Jim Garvin became the business's CEO.

In addition to the name change, WestMountain is also considering a reverse stock split in order to increase its share price as it considers applying to have its common stock listed on NASDAQ, according to the securities filing. Bloomberg and Yahoo list the stock's price at 25 cents per share. The company has about 54.8 million outstanding shares, and Targeted Technology owns almost 23.7 percent of them, according to the filing.

The company also announced that a fund associated with New York-based investment firm FirstFire Capital purchased a convertible note and common stock warrants for $200,000.

CytoBioscience acquired another Birmingham-based screening company, Soluble Therapeutics, in late 2016 in what Garvin told Xconomy was a multi-million-dollar deal. CytoBioscience planned to change the company's name to Soluble Biosciences and move it to San Antonio. BioDtech, meanwhile, will keep its name and remain in Birmingham, Garvin told the San Antonio Business Journal, which first reported the acquisition this morning.

35.    Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff in connection with the offer, purchase and/or sale of INVB securities, which closed on or about November 8, 2018.

36.    As an example of such material misrepresentations, omissions and/or misleading or false information, on or about February 7, 2019, the Defendants published and disseminated certain statements, entitled, *"InventaBioTech, Formerly CytoBioScience, Replaces CEO,"* which provided, in pertinent part, as follows:

*Xconomy Texas —San Antonio*—The CEO of InventaBioTech, a life sciences business formerly known as CytoBioScience, is stepping down and being replaced by an interim leader.

Jim Garvin, who has been the CEO of Inventa since March 2015, shortly before it moved to San Antonio, TX, from Germany, will remain an active contributor to the business, he wrote in an e-mail this morning. Garvin's responsibility was to establish Inventa in the U.S. and get it onto a "public platform," he wrote. Steven Charest, a New York investment banking executive, is taking over as the interim CEO.

Last year, when the San Antonio business was still known as CytoBioScience, it went through a reverse merger with Fort Collins, CO-based WestMountain Company, which was traded on the over-the-counter public markets. After rebranding as InventaBioTech, the business is now traded under the symbol INVB with OTC Markets Group.

"Taking the company far beyond that requires great skills, lots of energy, and tremendous amounts of time," Garvin wrote in the e-mail. "At 71, I can still be an active contributor and will (be), but this is the time for a new person to take the helm."

As Charest takes over, Garvin will remain a consultant with the business until at least 2021, the San Antonio Business Journal first reported and Garvin confirmed this morning. Charest is the chief market strategist and a managing director of Divine Capital Markets, a New York-based broker-dealer focused on investment banking services and equity research.

Garvin also previously worked at Divine Capital Markets for almost two years prior to joining Inventa in 2015, which may be the connection to Charest, who has worked at Divine since 2003, according to their LinkedIn profiles. Charest said he wasn't immediately available for comment. Divine is listed as receiving sales compensation in a March 2018 regulatory filing related to Inventa's intended merger.

Inventa sells a device, the CytoPatch, for screening the safety and efficacy of drug formulations, and it also provides contract research services. Its contract research accounted for most of its revenue during the first three quarters of 2018: $562,000, according to a securities filing. Equipment sales totaled $188,000 during that period, the filing shows.

Most of those sales came during the third quarter of last year: about $582,000 in equipment and contract research sales took place in the three months that ended Sept. 30. The company recorded only $168,000 in revenue from equipment sales and contract research during the first half of the year, according to the securities filing. It ended the first nine months of 2018 with a $3.77 million net loss, the filing shows.

Founded in 2001 in Germany, CytoBioScience was lured to San Antonio in 2015 by venture capital money and government incentives. The company has raised $15.8 million from some 11 investors since 2015, including San Antonio-based firm Targeted Technology, according to a regulatory filing. The city of San Antonio promised to give the company as much as $1 million for moving here, creating jobs, and investing around $15 million in making the Alamo City its headquarters. The city provided the startup with $500,000 of the money in 2015, and the business returned $100,000 of it in 2016,

according to a securities filing. Inventa and the city of San Antonio decided to terminate the agreement in April 2018, with the company agreeing to repay the remaining $400,000 it had received during a two-year period—with the first payment due in September, the securities filing shows. Inventa is in default with the agreement and negotiating with the city on potentially adjusting the deal, the filing says.

37.     Upon information and belief, the Defendants' statements were incomplete, misleading, and/or misrepresentative or omitted material information with a duty to disclose the same to the Plaintiff in connection with the offer, purchase and/or sale of INVB securities, which closed on or about November 8, 2018. Furthermore, upon information and belief, Defendant Garvin failed to inform the Plaintiff at or before the Closing of the Transaction of the material changes in senior executives at the Company, having already occurred (in the case of CFO Henry Bourg), or anticipated to occur shortly thereafter, with respect to himself, as CEO of INVB. *See, e.g.*, INVB Form 8-K, dated February 8, 2019 and as of Period Ending January 31, 2019, as attached, restated and incorporated by reference hereto as **Exhibit F.**

38.     Defendant INVB has committed fraud and has made material misrepresentations and omitted material information while having a duty to disclose the same to the Plaintiff, prior to and in connection with the offer, purchase and sale of securities with FirstFire, and in and in connection with the Transaction Documents by which the Plaintiff invested hundreds of thousands of dollars in the Company.

### C.     Defendants' Events of Default and Breaches of the Securities Purchase Agreement, Convertible Promissory Note, Officer's Certificate and COJ

39.     Based upon the fraud and deceit and securities fraud by the Defendants, the Plaintiff contends that it has a *bona fide* basis to prosecute claims on the Transaction Documents. Moreover, there can be no dispute that the Defendants have breached their various contracts with FirstFire, as memorialized by the Transaction Documents, including but not limited to the COJ, that was

executed under the pains and penalties of perjury by its CEO, James R. Garvin, individually and in his capacity as CEO of the Company.

40.     Thus, the Plaintiff asserts that the Company and Garvin incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the Note. These Events of Default included, *inter alia*, breaches of following provisions of the Transaction Documents: a) Sections 1.3 (Authorized Shares); b) Sections 1.4(d) (Delivery of Common Stock); c) Section 2.9 (Non-circumvention); d) Section 3.1 (Failure to pay principal or interest); e) Section 3.2 (Failure to Honor Conversion);  f) Section 3.4 (Breach of Agreement and covenants – Sections 2.9 of the Note (Non-circumvention) and 1.3 (Authorized Shares)); g) Section 3.4 (Breach of Representations and Warranties -Section 3(g) (SEC Documents; Financial Statements)) of that certain Securities Purchase Agreement;  h) Section 3.9 (Failure to Comply with the Exchange Act); and i) Section 4.14 (Failure to notify of Future Financing). Thereafter, it is undisputed that the Company incurred and/or caused several Events of Default, as set forth in Article III, entitled "*Events of Default*," of the FirstFire Note. In addition, pursuant to Section 3.1, an Event of Default shall have occurred by the failure of the Company and/or Garvin to pay the principal or interest when due on the Note, whether at maturity, upon acceleration, or otherwise. *See* Note (**Exhibit B**) § 3.1 & Exhibit B; COJ, at pp. 20-22. This Event of Default, with others, has continued to occur.

41.     Indeed, the Defendants stayed in compliance of their obligations to FirstFire, under the Transaction Documents, to timely file its SEC periodic reports for only six (6) days after the Closing Date. On or about November 14, 2018 and six (6) days after the Closing with the Plaintiff, the Company filed its Form 10-Q, for the last time, with the Commission. *See* INVB Form 10-Q, dated November 14, 2018 and as of Period Ending September 30, 2018, as attached, restated and incorporated by reference herein as **Exhibit G.** The Company has not filed another Form 10-Q or

a Form 10-K since on or about November 14, 2018. The Company failed and continues to fail to remain current with its SEC filings, as required by the Transaction Documents.

42.     Section 3.9 of the Promissory Note, entitled, "*Failure to Comply with the 1934 Act,*" provides, in pertinent part, as follows:

> "If at any time after the Issue Date, the Borrower shall fail to comply with the reporting requirements of the 1934 Act… it shall be an Event of Default."

Note (**Exhibit B**), at p.12.

43.     It is undisputed that the Defendants have breached their various contracts with FirstFire, as memorialized by the Transaction Documents, including but not limited to the COJ, executed under the pains and penalties by Defendant Garvin, individually and as CEO of the Company. *See* Note (**Exhibit B**), at pp. 20-22 & (COJ) Exhibit B thereto.

44.     Moreover, the COJ clearly demonstrates that the Company and Garvin have no defenses to the entry of Judgment against them in the instant litigation. For example, Paragraph 2 of the COJ, provides, in pertinent part, as follows:

> "I [James Garvin] hereby authorize the Supreme Court of the State of New York to enter judgment against Borrower in the amount of in the amount of the Default Amount plus a default interest rate of fifteen percent (15%) per annum on said amount from the date of any default, plus the costs and attorneys' fees that are set forth below, less any payments made on or after the date of this affidavit of confession of judgment, upon Borrower's failure for any reason to timely make any payment to FirstFire called for by the Note, due to Borrower's breach of Section 3.1 of the Note (failure to pay Principal or Interest) or due to Borrower's breach of its obligations that it owes to FirstFire pursuant to Sections 3.2-3.22 of the Note.

*See id.*, at p.21, ¶ 2 & (COJ) Exhibit B thereto.

45.     Additionally, by the COJ, the Company and Garvin have also admitted to the calculation of damages which FirstFire has suffered upon the breach of the Transaction Documents. *See id.* at p.20, ¶ 1 & (COJ) Exhibit B thereto.

46.     Paragraph 1 of the COJ further states, in pertinent part, that damages shall be:

"… in the amount of Two Hundred Twenty-Two Thousand ($222,000.00)…, less any payments made on or after the date of this affidavit of confession of judgment, plus interest at default interest rate of fifteen percent (15%) percent [sic] per annum on said amount…"

*Id.*

47.     In the COJ, the Company and Garvin have also agreed that compensatory damages include: a) the "principal" under the Note; b) "default interest [at a] rate of fifteen percent (15%)," c) "all other applicable penalties;" and d) "costs and attorneys' fees," as arising as a result of an Event of Default. *Id.*

48.     Upon the occurrence of an Event of Default under Section 3.1 of the Note, the entire principal and accrued interest shall be due and owing hereunder. Furthermore, an Event of Default pursuant to Section 3.23 of such Note, the Company is required to pay, and shall pay, the Fund the "Default Sum" (as defined therein), due under the Note as multiplied by One Hundred - Fifty and 00/100 (150.00%) percent. Thus, as of the, the Company owes the Fund, under the SPA and the Note, the Default Sum totaling approximately Three Hundred – Forty – Seven Thousand and 00/100 ($347,000.00) Dollars (U.S.). Until paid, the Default Sum shall continue to accrue the default interest rate of Fifteen and 00/100 (15.00%) percent per year, provided by the Note.

49.     In sum, the Defendants have committed securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and has perpetrated a fraud and deceit upon the Plaintiff, which suffered as a consequence. Throughout, the Defendants have been unjustly enriched and converted the Plaintiff's assets, causing it to suffer further damages and injuries. As a result of the fraudulent scheme, actions, concealment, and omissions of the Defendants, the Plaintiff lost substantial monies, lost profits, and lost opportunity in its investment assets.

## V. VIOLATIONS OF LAW

## COUNT I – VIOLATIONS OF FEDERAL SECURITIES LAW
### (solely as to Defendants INVB and James R. Garvin)

50.     The Plaintiff reasserts Paragraphs 1 through 49 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

51.     The Defendants violated Section 10(b) of the Exchange Act, 15 U.D.C. §78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, in that, as described herein, and in connection with the purchase, offer and sale of securities, they knowingly, recklessly and intentionally:

> a)     employed manipulative and deceptive devices and contrivances;
>
> b)     employed devices, schemes and artifices to defraud;
>
> c)     made untrue statements of material fact and omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and
>
> d)     engaged in acts, practices and a course of business which operated as a fraud or deceit upon the Plaintiff.

52.     During the relevant time period and as set forth herein, the Defendants, jointly and severally, singly and in concert, directly and/or indirectly, engaged in one or more common plans, schemes, and unlawful courses of conduct, to operate or perpetrate a fraud or deceit upon the Plaintiff, in connection with the offer, purchase and/or sale of INVB securities.

53.     During the relevant time period and as set forth herein, the Defendants, jointly and severally, singly and in concert, directly and/or indirectly, knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff in connection with the offer, purchase and/or sale of INVB securities.

54.     During the relevant time period and as set forth herein, the Defendants, jointly and

severally, singly and in concert, directly and/or indirectly, published and disseminated false, deceptive and untrue statements of material facts to the Plaintiff, and omitted material facts with a duty to disclose the same, in connection with the offer, purchase and/or sale of INVB securities.

55.     During the relevant time period and as set forth herein, the Defendants omitted material facts, with a duty to disclose such material facts, which a reasonable investor would require in order to make its investment decision, and in order to mislead the Plaintiff in connection with the offer, purchase and/or sale of INVB securities.

56.     During the relevant time period and as set forth herein, the Plaintiff relied upon the Defendants' material misrepresentations and the omissions to state material facts, with a duty to disclose the same, to its detriment.

57.     During the relevant time period and as set forth herein, the Defendants' purpose and effect of the scheme, plan, and unlawful course of conduct was, *inter alia,* to induce Plaintiff and others to purchase securities, and the Plaintiff was so induced and purchased said securities, to its detriment.

58.     As a direct and proximate cause of the Defendants' federal securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## COUNT II - BREACH OF CONTRACT
### (solely as to Defendants INVB and James R. Garvin)

59.     The Plaintiff reasserts Paragraphs 1 through 58 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

60.     Pursuant to the SPA, the Note, the Officer's Certificate and the COJ, FirstFire invested in the Company and sought to become a shareholder, in good faith, to join INVB and Garvin in the accomplishment of their business goals and in accordance with the standards of the business and the securities industry.  The Plaintiff contends that Defendants INVB and Garvin breached the contract with the Plaintiff by their conduct, as described herein.

61.     The Plaintiff alleges that the Company and Garvin are liable for a breach of contract and for a breach of an implied covenant of good faith and fair dealing. A breach of contract is failure without excuse to perform a duty which is due under the contract. Additionally, the interpretation of a contract is a question of law, not fact. If the wording is not ambiguous, then the contract must be enforced according to its plain terms.

62.     The Plaintiff performed its obligations under the Transaction Documents, including but not limited to the Purchase Agreement, the Note, the Officer's Certificate and the COJ, and in good faith.

63.     Defendants INVB and Garvin, by their conduct described herein, violated the Purchase Agreement, the Note, the Officer's Certificate and the COJ, breaching their contract with the Plaintiff.

64.     As a direct and proximate cause of the Defendants' breaches of their contracts, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

**COUNT III – BREACHES OF IMPLIED**
**COVENANT OF GOOD FAITH-FAIR DEALING**
**(solely as to Defendants INVB and James R. Garvin)**

65.     The Plaintiff reasserts Paragraphs 1 through 64 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

66.     It is well established in that every contract carries an implied covenant of good faith and fair dealing whereby the parties treat each other fairly and act in good faith and no party to the contract shall take any action to harm another party's rights under the contract. The duty imposed by this "implied covenant of good faith and fair dealing" pertains to bad faith in the performance of a contract, not just in its execution or negotiation. Implicit in every contract is the requirement on faithfulness to an agreed upon common purpose and consistency with the justified expectations of the other party.

67.     A breach of contract is the failure to perform for which legal excuse is lacking. As a matter of law, a contract existed, which the Company and Garvin breached and failed to comply with the covenant of good faith and fair dealing. The law is clear – FirstFire had a binding contract and the Company and Garvin have no legal basis, as a matter of law, to avoid their obligations under the Note or the damages, including but not limited to damages set forth pursuant to Section 3.9 of such Note, which arose as a result from the breach of the Transaction Documents.

68.     The Defendants had a duty of good faith and fair dealing in their dealings with the Plaintiff and pursuant to the promises, contract, and statements made to the Plaintiff to induce it to enter into the contract and provide assets to the Defendants in exchange for their promise to repay the same, with interest.

69.     Under the covenant, Defendants INVB and Garvin were obligated to good faith perform of their obligations under the Purchase Agreement, the Note, the Officer's Certificate and

the COJ with the Plaintiff, and to be faithful and consistent to the justified expectations of the Plaintiff.

70.     As described above, the Defendants breached the implied covenant of good faith and fair dealing with the Plaintiff.

71.     As a direct and proximate cause of the Defendants' breaches of the implied covenant of good faith and fair dealing, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## COUNT IV – UNJUST ENRICHMENT
### (solely as to Defendant CytoBioscience)

72.     The Plaintiff reasserts Paragraphs 1 through 71 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

73.     Defendant CytoBioscience illegally received assets and benefits from the Plaintiff, as arising from false and fraudulent statements and misrepresentations of Defendants INVB and Garvin, and without providing equivalent value therefor.

74.     The Defendant's actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted against the Plaintiff, to its detriment.

75.     Defendant CytoBioscience has been unjustly enriched by its actions and omissions, and by the actions and omissions of Defendants INVB and Garvin, as described herein.

76.     As a direct and proximate cause of Defendant CytoBioscience's unjust enrichment, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendant.

## COUNT V – BREACH OF FIDUCIARY DUTY
### (solely as to Defendants INVB and James R. Garvin)

77.     The Plaintiff reasserts Paragraphs 1 through 76 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

78.     A fiduciary relationship existed between the Plaintiff and the Defendants, requiring them to act with a duty of the utmost loyalty and trust on behalf of the Plaintiff.  As a fiduciary, the Defendants were required to maintain and protect the welfare of the Plaintiff.

79.     By engaging in the conduct described herein, the Defendants breached their fiduciary duties to the Plaintiff.

80.     As a direct and proximate cause of the Defendants' breach of fiduciary duty, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## COUNT VI - FRAUD AND DECEIT
### (solely as to Defendants INVB and James R. Garvin)

81.     The Plaintiff reasserts Paragraphs 1 through 80 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

82.     The actions of the Defendants described herein constitute fraud and deceit, including but not limited to the following:

a)      the Defendants made false representations of material facts, and/or omitted material facts with a duty of disclosure, knowing or having reason to know of their falsity;

b)      the Defendants made said misrepresentations and omissions for the purpose of inducing reliance from the Plaintiff; and

c)      the Plaintiff did rely upon said misrepresentations and omissions, to its detriment.

83.      As a direct and proximate cause of the Defendants' fraud and deceit, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

### COUNT VII - NEGLIGENT MISREPRESENTATION
**(solely as to Defendants INVB and James R. Garvin)**

84.      The Plaintiff reasserts Paragraphs 1 through 83 of the Complaint, together with **Exhibits**, and restates and incorporates them herein by reference.

85.      The conduct of the Defendants as described herein constitutes negligent misrepresentation in that the Defendants negligently provided the Plaintiff with erroneous and misleading information, and negligently omitted material information in its disclosures to FirstFire, while having a duty to disclose such material information, to the Plaintiff's detriment.

86.      As a direct and proximate cause of the Defendants' negligent misrepresentations, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

### COUNT VIII – CIVIL CONSPIRACY
**(Defendants INVB, CytoBioscience and James R. Garvin)**

87.      The Plaintiff reasserts Paragraphs 1 through 86 of the Complaint, together with the **Exhibits**, and restates and incorporates them herein by reference.

88.      The Defendants, together with others, combined, conspired, acted in concert, and/or engaged in a conspiracy by entering into an agreement with unlawful motives and/or means, and

undertook overt acts towards the ends of such conspiracy.

89.     In order to attain of the outcome of their conspiracy, the Defendants required coordination and actions to be taken in unison and/or in concert, together with joint tortious activity of the other co-conspirators.

90.     The Defendants had the particular power and/or authority in their business and business relationships to force, coerce, and/or encourage others to participate in this conspiracy and cause the offer, purchase and/or sale of INVB securities to the Plaintiff.

91.     The Defendants furthered the conspiracy by lending aid and encouragement to the others and ratifying and adopting the acts of its co-conspirators.

92.     Defendants' actions, courses of conduct, and omissions were wantonly, intentionally, and maliciously conducted, in concert and in a civil conspiracy, against the Plaintiff, to its detriment.

93.     As a direct and proximate cause of the Defendants' civil conspiracy, the Plaintiff has suffered, and continues to suffer, irreparable harm, and general, special, and consequential damages, including, but not limited to, loss of profits, interest, and other damages, injuries, and losses, to its detriment, and resulted in the unjust enrichment of the Defendants.

## VI. <u>REQUESTS FOR RELIEF</u>

WHEREFORE, the Plaintiff, FirstFire Global Opportunities Fund, LLC, respectfully requests that this Honorable Court grant it the following relief:

A)      Order, grant and enter temporary, preliminary and permanent injunctive and equitable relief, and specific performance, and finding that the Plaintiff has suffered irreparable harm, has a likelihood of success on the merits, that the balance of hardships favors the Plaintiff and that it is in the public interest to grant such temporary, preliminary and permanent injunctive and equitable relief, and specific performance for the benefit of the Plaintiff, as set forth herein;

B)      Determine that the Defendants are liable for all damages, losses, and costs, as alleged herein;

C)      Determine and award the Plaintiff, FirstFire Global Opportunities Fund, LLC, the actual losses sustained by it as a result of the violations of law by the Defendants, as set forth herein;

D)      Render a judgment and decision on behalf of the Plaintiff, FirstFire Global Opportunities Fund, LLC, on all Counts of the Complaint, and issue findings of fact and rulings of law, as necessary and appropriate, that the Defendants are liable, in all respects;

E)      Order, decide, adjudge, and determine that the liability of the Defendants, is for all losses, injuries, and damages, special, consequential, general, punitive, and/or otherwise, and for all interest and costs, as alleged herein;

F)      Award the Plaintiff, FirstFire Global Opportunities Fund, LLC, its costs, including, but not limited to, filing fees, costs, expenses and interest, for being required to prosecute this action;

G)      Award the Plaintiff, FirstFire Global Opportunities Fund, LLC, its actual attorneys'

fees, for being required to prosecute this action;

H)      Award the Plaintiff, FirstFire Global Opportunities Fund, LLC, multiple, double,

treble, and/or punitive damages in an amount to be determined;

I)      Enter judgment on behalf of the Plaintiff, FirstFire Global Opportunities Fund,

LLC, on the Complaint;

J)      Order declaratory relief, as appropriate and as this Honorable Court deems

necessary; and/or

K)      Any additional relief which this Honorable Court deems just and proper.


**THE PLAINTIFF, FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC,**
<u>**DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**</u>


Respectfully Submitted,
PLAINTIFF, FirstFire Global
  Opportunities Fund, LLC,

By its Attorneys,



    /s/  *Philip M. Giordano*
Philip M. Giordano, Esq. (MA BBO No. 193530)
Sophia E. Kyziridis, Esq. (MA BBO No. 703590)
  (*pro hac vice application to be filed*)
Giordano & Company, P.C.
REED & GIORDANO, P.A.
47 Winter Street, Suite 800
Boston, Massachusetts 02108-4774
Telephone: (617) 723-7755
Facsimile: (617) 723-7756
Email: pgiordano@reedgiordano.com
Email: skyziridis@reedgiordano.com

Dated: May 11, 2020